# UNITED STATES DISTRICT COURT

for the

Central District of California

**UNDER SEAL**

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| 2193 Puente Ave., Costa Mesa, CA 92627 ("SUBJECT PREMISES"). | ) ) ) ) ) ) ) | Case No. 8:21-MJ-00543 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized):*

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:

| 18 U.S.C. § 2252A(a)(5)(B), (b)(2) | Possession of Child Pornography |
|---|---|
| 18 U.S.C. § 2252(a)(4)(B)(i)(ii) | Accessing with Intent to View Child Pornography |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of ___ days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Aron Klaf
*Applicant's signature*

_____
HSI Special Agent Aron Klaf (562) 254-9077
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: Santa Ana, CA _____

_____
*Printed name and title*

AUSA: Andrew Beshai (213) 220-7927

**AFFIDAVIT**

I, Aron Klaff, being duly sworn, declare and state as follows:

## I.      INTRODUCTION

1.      I have been employed as a Special Agent ("SA") of the U.S. Department of Homeland Security, Homeland Security Investigations ("HSI") since February 2009, and am currently assigned to the HSI Orange County Child Exploitation Task Force ("OCCETF").  I have been assigned to OCCETF since January 2018.  Prior to my employment with HSI, I completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia, in March 2003.  From March 2003 to April 2004, I worked as a SA for the U.S. Department of Agriculture, Office of Inspector General.  From April 2004 through February 2009, I worked as a SA for the U.S. Department of Labor, Office of Labor Racketeering and Fraud Investigations.

2.      While employed by HSI as a SA, I have investigated federal criminal violations related to high technology or cybercrime, child exploitation, child pornography, internal employee misconduct, immigration fraud, money laundering, and the smuggling of illegal aliens.  I have a working knowledge of and have received training from other experienced agents and officers in, crimes involving child pornography and child exploitation.  In my role as a HSI SA, I have reviewed numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media, including computer media.  Moreover, I am a federal law enforcement officer engaged in enforcing criminal laws, including 18 U.S.C. §§ 2251, 2252, and 2252A, and I am authorized by law to request a search warrant.  During the course of investigations, I have executed, and have participated in the execution of search warrants, and have seized materials constituting evidence of offenses in violation of the United States Code.

## II.      PURPOSE OF AFFIDAVIT

3.      This affidavit is made in support of an application for a warrant to search the premises located at 2193 Puente Ave., Costa Mesa, CA 92627 (the "SUBJECT PREMISES"), more fully described below and in Attachment A, which is attached hereto and incorporated herein by reference.  The requested search warrant seeks authorization to seize any evidence, fruits, or

instrumentalities at the SUBJECT PREMISES of violations of 18 U.S.C. § 2252A(a)(5)(B) (possession of child pornography) and 18 U.S.C. § 2252(a)(4)(B)(i)(ii) (accessing with the intent to view child pornography) (the "Subject Offenses"), or any device that is itself an instrumentality of the Subject Offenses.

4.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III.     PREMISES TO BE SEARCHED

5.     The SUBJECT PREMISES is the property located at 2193 Puente Ave., Costa Mesa, California 92627, any outbuildings, and any appurtenances thereto.  The SUBJECT PREMISES is a single-story single-family home with an attached two-car garage.  The SUBJECT PREMISES's exterior is reddish brown in color, with white trim and a greyish-brown colored composite roof.  Black numbers "2193" are painted on the curb in black on a white background. The SUBJECT PREMISES is on the west side of Puente Ave where it intersects with Congress St. The white-colored front door is facing east and has a white-colored metal security screen.  There are a total of three rectangular-shaped windows with white painted trim affixed to the front exterior of the residence, facing east towards the curb.  The two-car garage door is white in color and has several rectangular embossed panels designed on its exterior.

## IV.     SUMMARY OF PROBABLE CAUSE

6.     On or about May 19, 2021, I received National Center for Missing and Exploited Children ("NCMEC"), CyberTipline Report (CT) 89813703.  According to the CT, Google account wolfman9956@gmail.com ("SUBJECT ACCOUNT") was used to upload three child pornography videos to the Google Drive Infrastructure.  Through further investigation, I learned the SUBJECT ACCOUNT is the subject of 9 other NCMEC CTs regarding suspect child pornography, for a total of 10 CTs.  Among other information, each of the 10 CTs provided the

reporting electronic service provider, the incident information, the user information being reported, and the uploaded file information (to include SUBJECT child pornographic content) on each of these cyber tips, which all bore the subject information as: Username "Sancho Sanchez", DOB 5/18/1983, email address SUBJECT ACCOUNT, and secondary email address mariomacias5699@gmail.com. I viewed the content of the 10 CTs involving the SUBJECT ACCOUNT and found that all 10 CTs contained suspect child pornography (CP) and/or child erotica videos and/or images.

7. Through a review of the 10 CTs associated with SUBJECT ACCOUNT, I identified a common IP address used to upload CP as "2603:8000:3f00:9982:7805:fbb3:6d6f:69d5" (herein referred to as "SUBJECT IP ADDRESS"). The above-listed 10 CTs provided the internet service provider for SUBJECT IP ADDRESS as Spectrum, with the geo-lookup information provided on each of the CTs resulting back to Costa Mesa, California.

8. An administrative summons was served on Charter Communications, Inc. for IP subscriber information relating to SUBJECT IP ADDRESS. Charter Communications, Inc. is responsible for all legal process for Charter Communications, Inc., Spectrum Services, and Time Warner Cable customers.

9. Charter Communications, Inc.'s response to the previously-served administrative summons included the following subscriber information:

Target Details: 2603:8000:3f00:9982:7805:fbb3:6d6f:69d5 (SUBJECT IP ADDRESS)

Subscriber Name: Mario Macias

Service Address: 2193 Puente Ave., Costa Mesa, CA 92627-2563 (SUBJECTS PREMISES)

10. Thus, there is probable cause to believe that the SUBJECT PREMISES contains evidence of the Subject Offenses.

## V.   <u>**DEFINITIONS**</u>

11.     The following terms have the indicated meaning in this affidavit:

a.      "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver.  Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation.  This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

b.      "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

c.      "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

d.      "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices.  *See* 18 U.S.C. § 1030(e)(1).

e.      "Computer hardware," as used herein, consists of all equipment that can

4

receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

f.      "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha- numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards.  Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby- trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

g.      "Geolocated," as used herein, refers to the identification of the geographical location of (a person or device) by means of digital information processed via the Internet.

h.      "Hashtag," as used herein, refers to a word or phrase preceded by a hash or pound sign ("#"), which is used to identify messages or groups on a specific topic.

     i.  A "hash value" is a unique multi-character number that is associated with a computer file. Some computer scientists compare a hash value to an electronic fingerprint in that each file has a unique hash value. Any identical copy of the file will have exactly the same hash value as the original, but any alteration of the file, including even a change of one or two pixels, would result in a different hash value. Hash values represent large amounts of data as much smaller numeric values, so they are used with digital signatures.

j.      "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

k.   An "Internet Protocol address" or "IP address," as used herein, refers to a unique numeric or alphanumeric string used by a computer or other digital device to access the Internet.  Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination.  Most Internet Service Providers ("ISPs") control a range of IP addresses.  IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer or device every time it accesses the Internet.  IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.  ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

l.      The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

m.   "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

n.      "Mobile application" or "chat application," as used herein, are small, specialized programs downloaded onto mobile devices, computers and other digital devices that enable users to perform a variety of functions, including engaging in online chat and sending or receiving images and videos.

7

o.    "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

p.    "Remote computing service," as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

q.    "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal- genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

r.    A "storage medium" is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, "thumb," "jump," or "flash" drives, CD-ROMs, and other magnetic or optical media.

s.    "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

t.    "PhotoDNA" creates a unique digital signature (known as a "hash") of an image which is then compared against signatures (hashes) of other photos to find copies of the same image. When matched with a database containing hashes of previously identified illegal images, PhotoDNA is an incredible tool to help detect, disrupt and report the distribution of child exploitation material. PhotoDNA is not facial recognition software and cannot be used to identify a person or object in an image. A PhotoDNA hash is not reversible, and therefore cannot be used to

recreate an image.

## VI.    <u>STATEMENT OF PROBABLE CAUSE</u>

12.    On or about May 19, 2021, I received NCMEC CT 89813703, which disclosed that, on March 8, 2021, the SUBJECT ACCOUNT uploaded to Google Drive three videos believed to be CP.  A person at Google viewed each of these three video files to the extent necessary to confirm that each file contained apparent CP concurrently to or immediately preceding the sending of the CT.

a.    Based on my training and experience, I know that Google Drive is a cloud-based storage system that allows Google account holders to store files in the cloud and access them anywhere from any smartphone, tablet, or computer.  In my experience, those who possess child pornography will often store child pornography on cloud-based servers or other decentralized systems, so it is not saved on digital devices in the direct possession of that person. According to the CT, the following information was associated with the SUBJECT ACCOUNT:

Account Name: Sancho Sanchez
Phone Number: 949-298-5087
Email Address: wolfman9956@gmail.com
Email Address: mariomacias5699@gmail.com

13.    The NCMEC CT also identified the following additional CTs as associated with the SUBJECT ACCOUNT as 89820877, 89598899, 89808192, 89786969, 89593685, 89587318, 89581525, 89571596, and 89567606.

**A. Summary and Descriptions of Suspect CP Files Uploaded by SUBJECT ACCOUNT using SUBJECT IP ADDRESS:**

14.    I viewed the content of 10 CTs involving the SUBJECT ACCOUNT and found that all 10 CTs contained child pornography and/or child erotica videos and/or images.  The CTs further indicated that a person at Google (the ESP) had viewed the files to the extent necessary to

confirm that it contained apparent child pornography concurrently to or immediately preceding the sending of each CT.

15.     Based on my review of these CTs, the following list includes the total number of suspect CP files associated with each CT, which together comprise a total of 51 suspected CP files:  CT 89813703 (3 videos), CT 89820877 (1 video), CT 89598899 (1 video), CT 89808192 (1 video), CT 89786969 (1 video), CT 89593685 (3 videos), CT 89587318 (5 videos), CT 89581525 (4 videos), CT 89571596 (3 videos), CT 89567606 (29 videos).

a.     One uploaded file from CT 89820877, filename "Google-CT-RPT-965526a1c0275083df4ddfdc7f36c109-VID-20171017-WA0061.mp4", 12:56 minutes in length, depicted a video compilation of two video clips merged into one video file.  Up through the 5:35 minute mark of the video, a 11-13 year old prepubescent nude female engages in sexual intercourse with an unknown adult male.  At the 5:36 minute mark of the video a new video (scene) begins with four 10–13-year-old prepubescent females lying nude on a bed.  One of the prepubescent females engages in masturbation/digital penetration while using an orange-colored object repeatedly rubbing the object against her genitalia.  The video continues and two of the prepubescent females engage in simulated oral sex as one of the females places the orange-colored object on the other female's genitalia and performs what appears to look like oral sex with her mouth on the object (that is pressed against the other female's genitalia).  Two of the other females in the video are posing while on all fours, also on the bed, while displaying their butts and genitalia.  As the video continues, two of the prepubescent females, one after the other, orally copulate the erect penis of an adult male. This video was uploaded by the subject on March 8, 2021, at 14:24:15 UTC using SUBJECT IP ADDRESS.

b.     One uploaded file from Cyber Tip 89813703, filename "Google-CT-RPT-165b856159b6a93c2addc11bbe64e2c1-VID-20171016-WA0041.mp4", 2:17 minutes in length, depicted an Asian prepubescent female approximately 10-12 years old, with black hair wearing a

blue-gray colored tank top, orally copulating the penis of an unknown male. This video was uploaded by the subject on March 8, 2021, at 14:20:50 UTC using SUBJECT IP ADDRESS.

     c.     One uploaded file from Cyber Tip 89567606, filename "Google-CT-RPT-738f8652105e54363ef0996240f8522a-VID20171023-WA0058.mp4", 2:46 minutes in length, depicted a nude Asian prepubescent female with black hair, approximately 8-10 years old, dancing on top of a bed. The prepubescent female dances in various positions with her legs spread while exposing and touching her genitalia and her chest.   This video was uploaded by the subject on March 8, 2021, at 14:24:10 UTC using SUBJECT IP ADDRESS.

### B. Macias' Connection to SUBJECTS PREMISES:

     16.     On June 29, 2021, I served an HSI administrative summons on Charter Communications, Inc. for IP customer subscriber information related to SUBJECT IP ADDRESS, for the specific dates and times of the uploaded video files (as described above). Charter Communications, Inc. is responsible for all legal process for Charter, Spectrum Services, and Time Warner Cable. According to Charter Communications, Inc.'s response, SUBJECT IP ADDRESS is subscribed to Mario Macias, 2193 Puente Ave., Costa Mesa, CA 92627-2563 (SUBJECTS PREMISES), email address MARIOMACIAS704@icloud.com, with phone number (949) 353-3280.

     17.     On July 7, 2021, I conducted a search in Accurint, which checks various public database records, and learned that Mario Eduardo Macias, date of birth May 18, 1983, currently resides at SUBJECT PREMISES and has been associated with the address since 2004.

     18.     On July 7, 2021, I checked California Department of Motor Vehicles ("DMV") records associated with Mario Macias by inputting his name, date of birth, California driver's license (CDL) number (D3116873). Mario Macias last renewed his CDL on February 18, 2021 and provided his residence address as SUBJECTS PREMISES. The DMV records: (1) contained a photograph of Mario Macias; (2) provided Macias's registered vehicles as a 2000

Mercedes 4-door sedan, California license plate 8VUS453, and (3) revealed that Mario Macias, date of birth May 18, 1983, resides at the SUBJECT PREMISES.

19.     On July 14, 2021, at approximately 1:20 pm, I went to the area where SUBJECT PREMISES is located and saw a silver Infiniti Q4 sedan, California license plate 5AAJ327, parked in the driveway at SUBJECTS PREMISES.  While conducting surveillance at SUBJECTS PREMISES, a Hispanic male driving a Mercedes 4-door sedan bearing California license plate 8VUS453, drove up to the front of SUBJECTS PREMISES and parked the Mercedes curbside directly in front of the residence.  The Hispanic male got out of the Mercedes, walked up to the front door, and entered SUBJECTS PREMISES through the front door.  Based on my previous review of CDL number D3116873, specifically the CDL DMV photo, I concluded that the Hispanic male closely resembled, and was most likely Mario Macias.

20.     On July 14, 2021, I conducted a vehicle query in California DMV's vehicle registration system database of the silver Mercedes 4-door sedan, California license plate 8VUS453, and learned that the vehicle was registered to "Mario Maciastorres", with the vehicle registration address as SUBJECTS PREMISES.  I also conducted a vehicle query of the Infiniti Q4 sedan, California license plate 5AAJ327, which revealed that there was no DMV record for the vehicle.

## VII.     TRAINING AND EXPERIENCE ON INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN

21.     Based on the information above, there is probable cause to believe that someone at the SUBJECT PREMISES possesses CP, and also might make it available for distribution. Based on my training and experience, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that individuals who view and possess multiple images of CP are often individuals who have a sexual interest in children and in images of children, and that there are certain characteristics common to such individuals:

a.     Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children or from

fantasies they may have from viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or in other visual media, or from literature describing such activity.

b.      Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides, and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.      Individuals who have a sexual interest in children or images of children sometimes possess and maintain "hard copies" of CP material – that is, pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc.  When they do, they generally possess these materials in the privacy and security of their home or some other secure location.  When individuals who have a sexual interest in children or images of children collect pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and/or videotapes, they often retain these materials for many years.

d.      Likewise, individuals who have a sexual interest in children or images of children often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer and surrounding area.  These collections are often maintained for several years and are kept close by, usually at the collector's residence, to enable the individual to view the collection, which is valued highly.

e.      Individuals who have a sexual interest in children or images of children may correspond with and/or meet others to share information and materials; often retain correspondence from other CP distributors/ collectors; conceal such correspondence as they do with their sexually explicit material; and often maintain lists of names, addresses, and telephone

numbers of individuals with whom they have been in contact with and who share the same interests in CP.

f.      Individuals who have a sexual interest in children or images of children prefer not to be without their CP for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

g.      Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

h.      Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.      For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

i.      The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

j.      Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

22.      Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.      Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.      Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

23.      The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.      Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one

or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.      In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.      Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress Macias' thumb and/or fingers on the device(s); and (2) hold the device(s) in front of Macias' face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

24.     Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

16

## VIII.   <u>CONCLUSION</u>

25.      For all the reasons described above, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2252A(a)(5)(B) (possession of child pornography) and 18 U.S.C. § 2252(a)(4)(B)(i)(ii) (accessing with the intent to view child pornography), as described in Attachment B to this affidavit, will be found in a search of the SUBJECT PREMISES, which is further described above and in Attachment A of this affidavit.

_____
ARON KLAFF
Special Agent
Homeland Security Investigations

Attested by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 6th day of August, 2021.

_____
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT
# A

## PREMISES TO BE SEARCHED

The SUBJECT PREMISES is the property located at 2193 Puente Ave., Costa Mesa, California 92627, any outbuildings, and any appurtenances thereto.  The SUBJECT PREMISES is a single-story single-family home with an attached two-car garage.  The SUBJECT PREMISES's exterior is reddish brown in color, with white trim and a greyish-brown colored composite roof.  Black numbers "2193" are painted on the curb in black on a white background.  The SUBJECT PREMISES is on the west side of Puente Ave where it intersects with Congress St.  The white-colored front door is facing east and has a white-colored metal security screen.  There are a total of three rectangular-shaped windows with white painted trim affixed to the front exterior of the residence, facing east towards the curb.  The two-car garage door is white in color and has several rectangular embossed panels designed on its exterior.

# ATTACHMENT B

## I.   ITEMS TO BE SEIZED

1.     The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 2252A(a)(5)(B) (possession of child pornography) and 18 U.S.C. § 2252(a)(4)(B)(i)(ii) (accessing with the intent to view child pornography) (the "Subject Offenses"), namely:

    a.     Child pornography, as defined in 18 U.S.C. § 2256(8).

    b.     Any records, documents, programs, applications, or materials, including electronic messages, that refer to child pornography, as defined in 18 U.S.C. § 2256(8), including documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchasing, or downloading, production, shipment, ordering, requesting, or trading of child pornography, or documents that refer to a transaction of any kind involving child pornography.

    c.     Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchasing, or downloading, production, shipment, ordering, requesting, or trading of child pornography, or involved in a transaction of any kind involving child pornography, as defined in 18 U.S.C. § 2256(8).

    d.     Any records, documents, programs, applications, or materials, including electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

    e.     Any and all records, documents, programs, applications, materials, or items that are sexually arousing to individuals who are interested in minors, but that are not in and of themselves obscene or that do not necessarily depict minors involved in sexually explicit conduct.  Such material is commonly known as "child erotica" and includes written materials

2

dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques relating to child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

f.  Any records, documents, programs, applications, or materials, including electronic messages, that pertain to the use of cloud storage providers to store child pornography or child erotica.

g.  Any records, documents, programs, applications, or materials, including electronic messages, that pertain to accounts with any Internet Service Provider.

h.  Any records, documents, programs, applications, or materials, including electronic messages, regarding ownership and/or possession of the SUBJECT PREMISES, i.e., 2193 Puente Ave., Costa Mesa, California 92627.

i.  Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

j.  With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

i.  evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii.  evidence of the attachment of other devices;

iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

3

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device; applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

vii.   records of or information about Internet Protocol addresses used by the device;

viii.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  SEARCH PROCEDURE FOR DIGITAL DEVICES

4.  In searching digital devices or forensic copies thereof, law enforcement personnel

executing this search warrant will employ the following procedure:

a.  Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.  The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.  The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic ToolKit), which tools may use hashing and other sophisticated techniques, including to search for known images of child pornography.

c.  If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.      In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.      During the execution of this search warrant, law enforcement is permitted to: (1) depress Mario Eduardo Macias's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of Mario Eduardo Macias's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.      The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not

apply to any search of digital devices pursuant to any other court order.